O

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| **ITT EDUCATIONAL SERVICES, INC.**<br><br>Plaintiff,<br>vs.<br><br>**THE CALIFORNIA STATE APPROVING AGENCY FOR VETERANS EDUCATION; THE CALIFORNIA DEPARTMENT OF VETERAN AFFAIRS,**<br><br>**Defendants.** | Case No.: SA CV 15-0884 DOC (JCGx)<br><br>**ORDER GRANTING EX PARTE APPLICATION FOR ORDER REMANDING THIS ACTION FOR LACK OF SUBJECT MATTER JURISDICTION OR, ALTERNATIVELY, FOR TEMPORARY RESTRAINING ORDER AND IMMEDIATE STAY OF CSAAVE'S SUSPENSION NOTICE [5]** |

Before the Court is Plaintiff's Ex Parte Application for Order Remanding this Action for Lack of Subject Matter Jurisdiction or, Alternatively, for Temporary Restraining Order and Immediate Stay of CSAAVE's Suspension Notice ("Ex Parte App.") (Dkt. 5). The Court finds this matter appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. For the reasons stated below, the Court GRANTS the Ex Parte Application, VACATES the hearing on this matter scheduled for Friday, June 19, 2015, and REMANDS this action to the state court.

**I. Background**

This case arises from allegations by Plaintiff ITT Educational Services, Inc. ("ITT"), a private, for-profit postsecondary educational institution, that Defendants California State Approving Agency for Veterans Education ("CSAAVE") and California Department of Veteran

Affairs ("CalVet") have unlawfully suspended their approval of ITT courses such that military veterans and their dependents can no longer use their G.I. Bill benefits to attend school at ITT.

### A. Statutory and Regulatory Framework

Title 38 of the United States Code governs veterans' benefits, which include rehabilitation, job training, and educational assistance services. In 2008, Congress enacted the Post-9/11 Veterans Educational Assistance Act ("Post-9/11 G.I. Bill" or "G.I. Bill"), codified at chapter 33 of Title 38. Pub. L. No. 110-252, 122 Stat. 2323 (2008). The Post-9/11 G.I. Bill provides up to 100% tuition payments for public schools, some funding for private schools, and additional payments for living and books. 38 U.S.C. § 3313.

The U.S. Department of Veterans Affairs ("VA") administers the G.I. Bill and oversees all decisions regarding individual veterans' and military dependents' eligibility to receive education benefits. *See* 38 U.S.C. § 3323. The VA, however, is not solely responsible for approving educational courses to which veterans can apply their G.I. Bill funds (often referred to as "Title 38 funds"). The G.I. Bill invites each state to establish a state approving agency ("SAA") to work closely with the VA to enforce federal regulations governing approval of courses. 38 U.S.C. § 3671(a) (requesting that the chief executive of each state create an SAA); *id.* § 3673 (recognizing importance of federal-state cooperation). The state may also impose its own regulations. *Id.* § 3672(a) (providing that SAA's approval of courses shall be in accordance with federal law "and such other regulations and policies as the State approving agency may adopt"). Generally, in order for veteran students to be able to use Title 38 funds to pay for a particular course of education, that course must be approved by the appropriate state's SAA, *id.* § 3676(a), unless the state does not have an SAA, in which case the VA will play the SAA's role for courses in that state, *see id.* § 3671(b)(1). *But see* 38 C.F.R. § 21.4152(b) (reserving VA's right to approve schools or courses notwithstanding lack of state approval).

An SAA "may" approve courses offered by proprietary for-profit education institutions such as ITT when such courses meet certain criteria. For instance, an SAA "may" approve courses that "have been accredited and approved by a nationally recognized accrediting agency or association." 38 U.S.C. § 3675(a)(1)(A); 28 C.F.R. § 21.4253(a)(1); *see also* 38 U.S.C. §

3675(a)(1)(B)-(D) (listing other courses that may be approved);  28 C.F.R. § 21.4253(a)(2)-(5) (same).

If a problem with approval arises after a course has already been approved, the SAA:

> (1) May suspend the approval of a course for new enrollments . . . for a period not to exceed 60 days to allow the institution to correct any deficiencies, if the evidence of record establishes that the course . . . fails to meet any of the requirements for approval.
>
> (2) Will immediately disapprove the course . . . , if any of the requirements for approval are not being met and the deficiency cannot be corrected within a period of 60 days.
>
> (3) Upon suspension or disapproval, the State approving agency will notify the educational institution by certified or registered letter with a return receipt secured (38 U.S.C. 3679). It is incumbent upon the State approving agency to determine the conduct of courses and to take immediate appropriate action in each case in which it is found that the conduct of a course in any manner fails to comply with the requirements for approval.

38 C.F.R. § 21.4259(a).

Federal statute provides that no federal department, agency, or officer is permitted to "exercise any supervision or control, whatsoever, over any State approving agency, or State educational agency, or any educational institution." 38 U.S.C. § 3682; 38 C.F.R. § 21.4152(a). Exceptions include, *inter alia*: (1) statutorily-mandated annual evaluations of the SAAs by the VA; (2) the VA may enter into contracts with SAAs to carry out approval activities and reimburse them for reasonable expenses and thus may monitor whether the SAAs are complying with the relevant standards and provisions of the law; and (3) the VA retains the right to disapprove schools or courses for reasons stated in the law and to approve schools or courses notwithstanding lack of state approval. 38 U.S.C. § 3674A(a); *id.* § 3674(a); 38 C.F.R. § 21.4152(b).

### B. Facts

CSAAVE, a division of CalVet, is California's SAA. It is responsible for ensuring that educational institutions in California meet federal and state criteria for receiving Title 38 funds. Cal. Educ. Code § 67101.

ITT is a private postsecondary educational institution established in 1969. Compl. ¶ 1. ITT has been approved to operate in California for many years based on its accreditation by the Accrediting Council for Independent Colleges and Schools ("ACICS"), a national accrediting organization. *Id.* ¶ 2. Courses offered at ITT campuses have also been approved by CSAAVE and accredited by ACICS for many years. *Id.* ¶ 3.

ITT has recently faced scrutiny from federal agencies regarding its private student loan programs and financial stability. In February 2014, the Consumer Financial Protection Bureau ("CFPB") filed a lawsuit in federal court in the Southern District of Indiana alleging that ITT had engaged in predatory lending practices by coercing students to take out high-interest private student loans that they could not hope to pay back. *Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*, No. 1:14-cv-0292 (S.D. Ind. filed Feb. 26, 2014). In March 2015, the U.S. Department of Education ("DOE") placed two ITT campuses on its Heightened Cash Monitoring list, a step that DOE's Federal Student Aid office can take "to provide additional oversight for a number of financial or federal compliance issues," ranging from late or missing annual financial statements and/or audits to concern about a school's financial responsibility. Federal Student Aid, *Heightened Cash Monitoring*, https://studentaid.ed.gov/sa/about/data-center/school/hcm (last visited June 15, 2015). On May 12, 2015, the Securities Exchange Commission ("SEC") filed a complaint in the same court alleging that ITT and two of its executives had misled investors about the student loan default rate of ITT students. *SEC v. ITT Educ. Servs., Inc.*, No. 15-CV-0758 (S.D. Ind. filed May 12, 2015).

Also on May 12, 2015, CSAAVE suspended its approval of ITT, effective May 11, 2015. According to the suspension notice, CSAAVE believed that ITT was not in full compliance with ACICS's financial stability standards for accreditation, "which is the basis for CalVet approval

under 38 CFR 21.4253(c)," based on information identified in ITT's Form 8-K filed April 29, 2015. Compl. Ex. 2, at 40. The Form 8-K states, in relevant part:

> *Among the factors that could cause actual results to differ materially are the following: the impact of the company's late filings with the SEC, including the 2014 Form 10-K; the impact of the adverse actions by the U.S. Department of Education (the "ED") related to the company's failure to submit its 2013 audited financial statements and 2013 compliance audits with the ED by the due date, and any failure to submit its 2014 audited financial statements and 2014 compliance audits to the ED by the due date . . . .*

*Id.* Ex. 7, at 4.

CSAAVE's notice of suspension stated that CalVet would proceed to withdraw its approval of ITT's courses should the discrepancy not be corrected within 60 days of the notice, i.e., by July 13, 2015. The notice ordered ITT to submit the following information by July 3, 2015: (1) evidence of current financial stability in accordance with ACICS's standards; (2) a copy of the roster of G.I. Bill-eligible students; and (3) a proposed notice of disclosure from ITT to G.I. Bill-eligible students that would require the students to acknowledge that ITT is temporarily suspended and that CSAAVE's withdrawal of approval of courses may occur no later than July 13, 2015 if ITT did not demonstrate compliance. *Id.* Ex. 2, at 41.

On May 18 and 19, 2015, ITT furnished CSAAVE with letters from ACICS stating that ITT was in compliance with ACICS's facility stability standards. *Id.* ¶¶ 48-50, Exs. 4-6. ITT has also provided the other items demanded in the notice of suspension (the list of G.I. Bill-eligible students and a proposed notice of disclosure). *Id.* ¶ 57. In addition, ITT has provided the additional materials requested by CSAAVE over the course of ITT's and CSAAVE's post-suspension email correspondence. *Id.* ¶¶ 61-66.

However, CSAAVE has thus far refused to rescind its suspension. Instead, CSAAVE stated in an email dated May 22, 2015 that it would appoint a "specialist" to work with ITT on the notice of disclosure and to review ITT's other submissions. CSAAVE would notify ITT of its decision by July 11, 2015. *Id.* ¶ 67, Ex. 8. CSAAVE has also sent ITT a revised proposed notice of disclosure to send out to its G.I. Bill-eligible students. *Id.* ¶ 73, Ex. 10.

Meanwhile, ITT's summer quarter began on Monday, June 15, 2015. *Id.* ¶ 12.

### C. Procedural History

This lawsuit was filed on June 1, 2015 in the Orange County Superior Court. Compl. (Dkt. 1-2). The next day, ITT sought a temporary restraining order from the state court (Dkt. 1-3). Defendants removed the case to federal court on June 4 on grounds of federal question jurisdiction under 28 U.S.C. §§ 1331 and 1441(a). *See* Notice of Removal (Dkt. 1) ¶ 11.

The Complaint seeks three forms of relief:

(1) Writ of mandate under California Code of Civil Procedure § 1085 to rescind CSAAVE's suspension of ITT;

(2) Declaratory judgment that CSAAVE/CalVet's suspension of ITT was unlawful; and

(3) Temporary restraining order, preliminary injunction, and permanent injunction enjoining CSAAVE/CalVet from enforcing CSAAVE's suspension of ITT, from issuing any notice to ITT's veteran students about the suspension, and from making any independent determination as to whether ITT is in compliance with ACICS's accreditation standards.

Plaintiff filed the instant Ex Parte Application on June 8 (Dkt. 5). Defendants filed an opposition on June 11 (Dkt. 9) and Plaintiff a reply on June 15 (Dkt. 12).

## II. Remand for Lack of Subject Matter Jurisdiction

### A. Legal Standard

Removal of a case from state to federal court is governed by 28 U.S.C. § 1441, which provides in pertinent part that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to the district court of the United States for the district and division embracing the place where such action is pending." The removing defendant must file a notice of removal in the appropriate United States District Court, together with all process, pleadings, and orders served upon the defendant. 28 U.S.C. § 1446(a). Remand may be ordered for lack of subject matter jurisdiction or any defect in the removal procedure. 28 U.S.C. § 1447(c).

To protect the jurisdiction of state courts, removal jurisdiction should be strictly construed in favor of remand. *Harris v. Bankers Life and Cas. Co.*, 425 F.3d 689, 698 (9th Cir.


2005) (citing *Shamrock Oil & Gas Corp. v. Sheet*, 313 U.S. 100, 108–09 (1941)). If there is any doubt as to the right of removal in the first instance, remand must be ordered. *See Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1393 (9th Cir. 1988). "The party seeking removal bears the burden of establishing federal jurisdiction." *Id.*; *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936).

Defendants contend that the federal court has federal question jurisdiction over this case under 28 U.S.C. § 1331. *See* Notice of Removal ¶ 11. The presence or absence of federal question jurisdiction is governed by the well-pled complaint rule, which provides that federal question jurisdiction exists only when a federal question is presented on the face of plaintiff's properly pled complaint. *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1183 (9th Cir. 2002). The existence of a defense based on federal law is insufficient to support jurisdiction, even if both parties agree that the federal defense is the only question truly at issue. *Id.*; *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986).

There is no "single, precise, all-embracing" test for federal question jurisdiction. *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). For instance, that the plaintiff does not allege a federal cause of action does not necessarily mean the court lacks federal question jurisdiction. A federal question may be found if the plaintiff's right to relief under state law necessarily depends on resolution of a "substantial" and disputed question of federal law. *Federal Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27-28 (1983); *see also Merrell Dow*, 478 U.S. at 810-12. "Substantial" does not refer to how important the issue is to the claims or to the parties in the action. Rather, the substantiality inquiry "looks . . . to the importance of the issue to the federal system as a whole." *Gunn v. Minton*, 133 S. Ct. 1059, 1066 (2013). There must exist "a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable*, 545 U.S. at 313.

Ultimately, even if a disputed, necessary, and substantial federal issue exists, "the federal issue will . . . qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." *Id.* at 313-14. In determining whether a federal issue in a

state-law claim creates federal question jurisdiction, a court must consider a "welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system." *Id.* at 314 (quoting *Franchise Tax Bd.*, 463 U.S. at 8). The fact that Congress has not created a private, federal cause of action under which a plaintiff can seek relief serves as strong evidence of Congress's intent. *Id.* at 318. However, it is not dispositive and the court should consider other factors as well. In *Grable*, for instance, the Supreme Court determined that federal jurisdiction existed over a state-law quiet title claim that turned on whether, under federal tax law, the IRS had given adequate notice to the former landowner before seizing the property and selling it to a third party. The Court determined that the tax question was an "important issue of federal law that sensibly belongs in a federal court" because (1) the government had a strong interest in having a federal forum through which to collect delinquent taxes; (2) buyers and tax delinquents could find it valuable to appear before judges familiar with federal tax law; and (3) few state quiet-title cases would raise a contested matter of federal law, such that exercising federal jurisdiction in this case would have "only a microscopic effect on the federal-state division of labor." *Id.* at 315.

Since *Grable*, the Supreme Court has cautioned that few cases will fit into the "special and small" *Grable* category. *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699, 701 (2006).

### B. Discussion

Here, Plaintiff alleges that Defendants' suspension of ITT violates federal statutes and regulations. Plaintiff contends that CSAAVE is required under federal law to approve ITT's courses so long as ITT's courses are accredited by ACICS and that CSAAVE cannot substitute its own judgment about whether ITT has met ACICS's standards for ACICS's judgment. *See* Compl. ¶¶ 52, 86. Plaintiff also contends that CSAAVE cannot suspend ITT's ability to issue enrollment certifications for currently enrolled G.I. Bill-eligible students and that the suspension can only be applied to "new enrollments" under 38 C.F.R. § 21.4259(a)(1). *See id.* ¶¶ 37, 42-43. Plaintiff seeks a writ of mandate, pursuant to California Code of Civil Procedure § 1085, to compel Defendants to perform their duty under federal law and rescind the suspension. Plaintiff

also seeks injunctive and declaratory relief, although the Complaint does not specify whether Plaintiff seeks injunctive or declaratory relief under federal or state law.

Defendants argue that Plaintiff's allegations raise substantial federal issues such that the Court has federal question jurisdiction. Plaintiff argues that the Court lacks subject matter jurisdiction because Congress has not created a private federal cause of action. The Court agrees with Plaintiff that the Court lacks subject matter jurisdiction.

The key disputes in this action are based on federal law—namely, whether CSAAVE's suspension of ITT violated the G.I. Bill statute and regulations. Because Plaintiff has not articulated any other theory for its entitlement to the relief it seeks, the federal issues are necessary to resolving the case. Thus, the question is whether the federal issues are "substantial," i.e., important to the federal system as a whole, and whether recognizing federal jurisdiction in this case would be consistent with Congress's division of labor between state and federal courts.

Courts have not yet developed clear rules regarding if and when federal question jurisdiction exists over a party's challenge to the way a state agency carries out federal duties. *See* Abbe R. Gluck, *Intrastatutory Federalism and Statutory Interpretation: State Implementation of Federal Law in Health Reform and Beyond*, 121 Yale L.J. 534, 615 n.220 (2011) (citing cases).[1] This case illustrates why that is, as resolving the question involves sensitive judgments about federalism, administrative law, and federal jurisdiction, some of the most intricate and least intuitive topics in the law. In this particular case, following the Supreme Court's instruction in *Grable* to consider not just whether federal issues are disputed and necessary to a case but whether they are substantial and whether exercising jurisdiction would

---

[1] The Supreme Court recently held that the Eleventh Amendment did not bar a case—that is, federal jurisdiction existed over a case—brought by a state agency in Virginia which was created by the Commonwealth of Virginia for the purpose of carrying out federal duties and which was suing another state agency's officials under the federal law it was implementing. *Virginia Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1642 (2011) ("*VOPA*"). This case is distinguishable, however, because unlike in *VOPA*, the federal statute at issue in this case does not purport to allow enforcement of the federal statute through the court system. *See id.* at 1636. The state defendant in this case, CSAAVE and CalVet, also affirmatively consented to litigating in federal court by removing the case to federal court, unlike the state defendants in *VOPA*, who argued that they were immune from suit under the Eleventh Amendment. *Id.* at 1637.

disrupt federal and state judicial responsibilities, and taking seriously the Ninth Circuit's exhortation that doubts about removal jurisdiction should be resolved against removal jurisdiction, *see Ethridge*, 861 F.2d at 1393, this Court concludes that it lacks federal question jurisdiction over Plaintiff's action.

Congress has not created a private right of action for violations of the federal statutes and regulations governing educational institutions' eligibility to receive Title 38 funding. In fact, in the Title 38 context, Congress affirmatively restricted federal agencies' ability to supervise and control the SAAs, suggesting that Congress's intent in designing the cooperative federalism aspects of the G.I. Bill was to limit federal overreach. *See* 38 U.S.C. § 3682; 38 C.F.R. § 21.4152(a). Moreover, the federal Administrative Procedures Act generally does not allow federal courts to review the actions of state agencies. *See* 5 U.S.C. § 701 (defining "agency" as "each authority of the Government of the United States"); Josh Bendor & Miles Farmer, Note, *Curing the Blind Spot in Administrative Law: A Federal Common Law Framework for State Agencies Implementing Cooperative Federalism Statutes*, 122 Yale L.J. 1280, 1290-91 (2013) (noting that the legislative history of the federal Administrative Procedures Act is completely silent on whether state agencies would be covered, likely because cooperative federalism regimes were not as common in the 1940s as they are today).[2] Thus, it is unlikely that Congress viewed the federal government as having a strong interest in ensuring national uniformity in interpreting the approval of courses provisions in the G.I. Bill. It is also doubtful that Congress intended for the federal courts to review state agencies' compliance with the G.I. Bill statute and regulations or to issue mandates to those state agencies when they stray.

With regard to the potential impact of recognizing federal jurisdiction in this case on the federal judicial system, cases like this one would not, like the state tort cases in *Merrell Dow*, necessarily "herald[] a[n] . . . enormous shift of traditionally state cases into federal courts."

---

[2] In *Gilliam v. Miller*, 973 F.2d 760 (9th Cir. 1992), the Ninth Circuit held that a state adjutant general, who was required by federal law to employ and administer federal civilian employees, acted in the capacity of a federal agency when he supervised the plaintiffs in that case as federal civilian technicians, suggesting that, in some special circumstances, state agency action could be challenged under the federal APA. *Id.* at 762-63. Here, however, Plaintiff has not alleged a claim under the federal APA, nor have Defendants argued that a lurking federal APA issue is a basis for federal question jurisdiction.

*Grable*, 545 U.S. at 318. Cooperative federalism statutes such as the G.I. Bill, which create a role for state agencies in implementing federal law, are relatively common today. However, given that they are a fairly modern innovation, allowing plaintiffs to sue state agencies in federal court under cooperative federalism statutes would not exactly "shift" the volume of litigation from state to federal court, since such cases were not "traditionally" brought in state court. Nevertheless, allowing this case to proceed in federal court would have more than a "microscopic effect on the federal-state division of labor," *id.* at 309, as it would allow private parties to bring actions against state agencies that Congress has not expressly intended to be litigated in federal court. This, in combination with the Supreme Court's cautionary words that few cases fit into the *Grable* category, *Empire*, 547 U.S. at 701, the Court's confidence in the federal and state courts' equal ability to handle federal questions as well as the Court's reluctance to gamble with this Court's and the parties' resources by proceeding with this case on an uncertain basis for federal question jurisdiction, persuades this Court that this case should be remanded to state court.

### C. Conclusion

In conclusion, the Court holds that it lacks federal question jurisdiction in this case. Thus, the Court will not rule on Plaintiff's alternative request for a temporary restraining order and REMANDS the action to the Orange County Superior Court.

DATED:     June 17, 2015

_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE